**FILED**
**Dec 22, 2020**
**10:29 AM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
### AT NASHVILLE

| | | |
|---|---|---|
| **Medhat Said,** | ) | **Docket No. 2018-06-0433** |
| **Employee,** | ) | |
| **v.** | ) | |
| **Communications Test Design, Inc.,** | ) | **State File No. 60229-2019** |
| **Employer,** | ) | |
| **And** | ) | |
| **Zurich American Insurance Company,** | ) | **Judge Kenneth M. Switzer** |
| **Carrier.** | ) | |

---

## COMPENSATION ORDER

---

The threshold issue in this case is the compensability of Medhat Said's claim regarding a gradual injury he suffered while working for Communications Test Design, Inc. Two well-qualified experts, both of whom treated Mr. Said, have reached vastly different opinions on this complex question of medical causation. After a December 16, 2020, compensation hearing, the Court accepts the opinion of Mr. Said's unauthorized physician and holds that he suffered a compensable injury.

As to his requested relief, it flows from that conclusion that Mr. Said is entitled to future medical benefits. The Court awards permanent partial disability benefits but denies increased benefits. Also, Mr. Said is entitled to past temporary disability benefits and reimbursement from CTDI for some of the medical bills relative to the work injury. But the Court denies his request for attorney's fees from an alleged wrongful denial of the claim and declines to refer the case for consideration of a penalty.

### Claim History

*Employee Testimony and Treatment*

Mr. Said worked for CTDI as a materials handler, scanning boxes. He testified that the work was fast-paced and high-volume. On August 7, 2017, he reported pain in his left shoulder from working. CTDI authorized treatment, and he later chose Dr. Malcolm Baxter from a panel.

1

At the first visit in early October, Dr. Baxter wrote that Mr. Said's pain "started after scanning a lot of boxes," and "sharp pain with repetitive motions involved with his job." Dr. Baxter concluded, "This does appear to be work related more than 50% based on his history." He provided conservative treatment.

At the next visit on October 31, Dr. Baxter placed restrictions and ordered a shoulder MRI. The MRI report found "[n]o threshold evidence for rotator cuff or glenoid labral tear." At the next visit on December 11, Dr. Baxter noted, "MRI really does not show any evidence of rotator cuff tearing or significant tendinitis." He removed the restrictions, released Mr. Said from treatment, and assigned a zero-percent impairment rating. CTDI could not accommodate the restrictions, and it did not pay temporary disability benefits from October 31 through the date of maximum medical improvement designated by Dr. Baxter.

Mr. Said returned to Dr. Baxter in February 2018, stating that his shoulder still hurt. At that time, Dr. Baxter wrote that the work incident "really wasn't an injury, more just using the arm," and he altered his causation opinion by noting, "I don't see any evidence of a work related injury." After receiving the revised causation opinion, CTDI denied further treatment.

Mr. Said then sought treatment on his own from Dr. Jason Jones. In March, Dr. Jones performed surgery. The operative report states that he found "fraying and tearing" on the anterior labrum and a "fairly large tear" to the subscapularis, and he performed an open biceps tenodesis. Mr. Said continued to treat with Dr. Jones afterward and participated in physical therapy.

Dr. Jones took him off work while he rehabilitated from surgery. However, in June, Mr. Said opened a restaurant and began working there as the manager. He did not offer evidence about how much he earned in the new position but simply said he needed to support his family.

On October 9, 2018, Dr. Jones placed Mr. Said at maximum medical improvement and restricted him from performing any repetitive motion with the left arm. Afterward, CTDI terminated him.

Mr. Said's personal insurance covered treatment with Dr. Jones. However, he testified that he paid Dr. Jones $210.00 and $910.00 for physical therapy out-of-pocket. He also paid $271.71 to the surgery center, which is documented in bills attached to an affidavit signed by Dr. Jones. Dr. Jones wrote that Mr. Said's bills for treatment, the surgery center and physical therapy were reasonable and necessary, and CTDI stipulated to this at a previous hearing.[1]

---

[1] Several bills are attached to Dr. Jones's affidavit. The affidavit does not show how much Mr. Said paid him. However, Mr. Said's testimony was undisputed on this point. The affidavit contains an explanation of benefits for anesthesia but not a bill. The affidavit also has a bill from Southern Hills, which Dr. Jones

*Dr. Jones's Testimony*

Dr. Jones testified that he is an orthopedic surgeon who specializes in shoulders and received training abroad from a world-renowned expert.[2] Ex. 7 at 6-7. He reviewed the records from Dr. Baxter's December 2017 encounter with Mr. Said. *Id.* at 44. Dr. Jones based his initial diagnosis on the "presenting complaint" of shoulder pain with repetitive motion and his clinical examination. *Id.* at 11. Specifically, he performed an O'Brien test suggesting either biceps pain or labral tearing; Mr. Said exhibited signs on the test and also had "very specific anterior shoulder pain." *Id.* at 12-13.

Dr. Jones explained his surgery recommendation as follows:

He had very point-specific physical examination findings. He had this rather profound complaint of inability to work and anterior shoulder pain and this was affecting his life in multiple ways. He tried conservative treatment. And everything lined up fairly well with biceps and labral complex tearing. So that's where the decision came to discuss surgery, because nothing else was working. This was affecting his life. And he certainly had signs and symptoms compatible with that.

*Id.* at 14.

Dr. Jones performed both arthroscopic and open surgery. *Id.* at 17. During surgery, Dr. Jones discovered a superior border subscapularis tear and a biceps tendon tear. *Id.* at 16-17. He repaired the biceps tendon tear but did not repair the subscapularis tear because "the tissue quality in this case [was]n't good enough to repair." *Id.* at 17. Instead, he debrided the subscapularis, which is "a very standard way to treat subscapularis, you know, small tears." *Id.* at 18. Dr. Jones said, "[H]e had significant pathology on his *arthroscopic exam, which is certainly the most sensitive and specific way to look at any kind of injury."* *Id.* at 18 (Emphasis added).

Before the procedure, Dr. Jones excused Mr. Said from work beginning February 23, 2018, and he released him to return to work with restrictions on October 9, 2018. *Id.* at 24. On that date, Dr. Jones assigned maximum medical improvement. *Id.* at 25. He placed a three-percent upper extremity impairment and one-percent whole body permanent impairment. *Id.* at 39-40. Dr. Jones found a class one injury and used a grade one modifier. *Id.* at 38. According to the causation letter mentioned below, he used the diagnosis-based impairment chart on page 402 of the AMA *Guides.* During the deposition, he clarified that the upper-extremity impairment rating should be three percent. *Id.* at 40.

---

did not mention in the affidavit. Mr. Said testified regarding these sums, but the Court did not admit the bills into evidence and denies the request that CTDI pay them.

[2] Dr. Jones's resume was not made an exhibit to his deposition testimony.

At the deposition, Dr. Jones additionally reviewed a causation letter that he signed from Mr. Said's attorney, stating that he stood by his responses. *Id.* at 31. In that letter, Mr. Said's attorney asked Dr. Jones whether he could state within a reasonable degree of medical certainty that Mr. Said's employment contributed more than fifty percent in causing his injury, considering all causes, and whether repetitive movement is a common cause of tendonitis. Dr. Jones circled "yes" to both questions. He also wrote that the surgery was reasonable and necessary. *See generally* Ex. 8 to Dr. Jones's deposition, Ex. 7.

On cross-examination, Dr. Jones acknowledged that he saw only the MRI report and not the actual images. *Id.* at 44. He said he did not see a difference between "fraying" and a tear, in reference to his post-surgery diagnoses of subscapularis and biceps tendon tears. *Id.* at 44-45. He added that Mr. Said's subscapularis was "pretty significantly torn at the superior border, and it was *obviously chronic just from the pattern. It was more of these loose fibers, like I described earlier, like almost looking like a mop handle, which generally suggests this has occurred over time.*" *Id.* (Emphasis added).

Cross-exam also focused on Dr. Jones's impairment rating. Dr. Jones acknowledged that "subjective complaints of pain" as well as "actual pathologies, actual anatomical injury" accounted for the rating. *Id.* at 49-50.

*Dr. Baxter's Testimony*

CTDI countered Dr. Jones's testimony with Dr. Baxter's. He is also an orthopedic surgeon who specializes in shoulders, and he is board-certified. Ex. 8 at 5-6.

Dr. Baxter explained that he examined Mr. Said and performed an impingement test, which resulted in "positive signs" of shoulder pain, which is suggestive of tendinitis, inflammation or a tear. *Id.* at 8, 36.

Much of Dr. Baxter's opinion revolved around the MRI. Dr. Baxter said the MRI report and images were "normal" and showed no pathology to the subscapularis. *Id.* at 14. Dr. Baxter testified—repeatedly—that the MRI did not show a torn labrum, and he reasoned that if Dr. Jones had seen this type of tear, he would have fixed it not merely debrided it. Dr. Baxter explained, "[H]e said he debrided it, which is usually indicative that it was not substantial enough, and it was probably a degenerative-type labral tear, which most of us get if we've worked hard in our lives." *Id.* at 16-17. He likewise said the MRI did not show a biceps tendon tear. *Id.* at 17. He said the operative images of the bicep looked "pretty good," and while they showed fraying, he did not see a tear of significance to merit its repair. *Id.* at 18, 72.

Dr. Baxter acknowledged that his causation opinion changed over time. He clarified that, when he wrote that the injury "appear[s] to be work related" after the first visit, he

4

meant that Mr. Said's "pain" was work-related. *Id.* at 12. Dr. Baxter also reviewed his notes from the final, February 2018 visit, and testified:

> [W]hat we started out with was a work-related injury, work-related pain, after further evaluation, it ended up, in my opinion, that there was no work injury there; there was no injury, period. There was no injury there. So I'm not saying he didn't have pain; I'm just saying, based on the best test we have, which was the MRI, there was no evidence of any injury there.

*Id.* at 24. He gave a similar answer when asked whether Mr. Said sustained an injury to his left shoulder that primarily arose out of his employment. Dr. Baxter concluded, "I did not see an objective injury that I could relate . . . to his employment." *Id.* at 87.

On cross-examination, Dr. Baxter confirmed that he understood that Mr. Said performed "fast-paced, high-volume, scanning." *Id.* at 33. He agreed that this work could cause a shoulder injury. *Id.* Dr. Baxter acknowledged that it is "possible" that an MRI might not show every tear. *Id.* at 36. However, he estimated they are "96-or-plus percent" accurate. *Id.* at 49. Dr. Baxter further conceded that he has had a case where an MRI did not show "something," but while performing surgery he found "something." *Id.* at 65. On re-direct, he said that it is "very unlikely" that an MRI would miss both a biceps tendon and subscapularis tear. *Id.* at 83.

Dr. Baxter maintained his causation opinion on cross. He said that shoulder fraying takes "years" to develop, not "months." *Id.* at 46-47. He explained that a labral tear is typically due to "trauma" rather than overuse, while overuse injuries are normally tendinitis and associated with rotator cuff tears. *Id.* at 47. Dr. Baxter later clarified that "[d]islocation and traumatic type injuries were the main cause of labral tears." *Id.* at 64-65.

**Findings of Fact and Conclusions of Law**

The employee in a workers' compensation claim has the burden of proof on all essential elements of the claim. *Scott v. Integrity Staffing Solutions*, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Aug. 18, 2015). At this compensation hearing, Mr. Said must prove entitlement to the requested benefits by a preponderance of the evidence. Tenn. Code Ann. § 50-6-239(c)(6) (2020).

*Medical Causation*

The threshold issue is whether Mr. Said's claim satisfies the definition of "injury" in the Workers' Compensation Law. Tennessee Code Annotated section 50-6-102(14) defines an "[i]njury" in relevant part as "an injury by accident . . . or cumulative trauma conditions including . . . repetitive motion conditions, arising primarily out of and in the course and scope of employment, that causes . . . the need for medical treatment[.]" Mr. Said must show, by a preponderance of the evidence and to a reasonable degree of medical certainty, that the employment contributed more than fifty percent in causing the injury,

5

considering all causes. Tenn. Code Ann. § 50-6-102(14)(B)-(C). "The opinion of the treating physician, selected by the employee from the employer's designated panel of physicians . . . shall be presumed correct on the issue of causation but this presumption shall be rebuttable by a preponderance of the evidence." Tenn. Code Ann. § 50-6-102(14)(E).

Applying these principles, Dr. Jones testified on cross-examination during his deposition that when he observed the condition of the subscapularis during surgery, it was "pretty significantly torn," "obviously chronic," and it was generally suggestive that "this has occurred over time." In contrast, Dr. Baxter, whose opinion is presumed correct, testified that the MRI did not show a torn labrum or biceps tendon, and his opinion was based on "objective" findings. He praised MRIs for their accuracy and said that "fraying" is degenerative and occurs over years not months.

These physicians gave opposite opinions on causation, responding to questions couched in terms of the statutory definition of "injury." CTDI argued that merely standing by previous answers to a causation letter is insufficient. But the fact that Dr. Jones did not restate his opinion that the injury arose primarily out of employment at his deposition is not fatal to Mr. Said's claim. Eliciting that testimony would have been helpful, but Dr. Jones did identify the letter, review it, and testify that he stood by those responses. Also, CTDI chose not to cross-examine Dr. Jones about the opinion and simply objected to the admissibility of the letter as an exhibit, even though Dr. Jones identified it and confirmed his stated position remained the same.

This case requires that the Court make a close call on this issue. In evaluating conflicting expert testimony, a trial court may consider, among other things, "the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information through other experts." *Brees v. Escape Day Spa & Salon,* 2015 TN Wrk. Comp. App. Bd. LEXIS 5, at *14 (Mar. 12, 2015).

The Court finds both experts are highly qualified, so this factor favors neither. As to the circumstances of their examinations, both physicians saw Mr. Said for treatment about the same number of times and performed physical examinations at each visit. Contrary to counsel's assertions, O'Brien's Signs versus an Impingement Test does not sway the Court either way, nor is it determinative whether Mr. Said moved during the MRI, a point argued by Mr. Said.

Considering the information available to them and the importance of that information through other experts, Dr. Baxter read all other providers' records; Dr. Jones read only Dr. Baxter's. This difference is minor, however, because the other providers treated him sporadically and were not orthopedic specialists. The critical records for Dr. Jones to consider were Dr. Baxter's when he determined the injury was not work-related. Dr. Baxter relied heavily on the MRI, which images and report he reviewed, while Dr. Jones did not see the images. This difference, too, is not of great significance.

6

What sets these experts apart significantly is that Dr. Jones performed surgery—arthroscopically and by opening the patient—to directly observe the inner condition of Mr. Said's shoulder. He saw "significant pathology on his arthroscopic exam, which is certainly the most sensitive and specific way to look at any kind of injury." The subscapularis was "pretty significantly torn at the superior border, and it was *obviously chronic just from the pattern. It was more of these loose fibers, like I described earlier, like almost looking like a mop handle, which generally suggests this has occurred over time.*" Dr. Jones actually saw this, and his explanation that the condition developed gradually is reasonable. In contrast, Dr. Baxter viewed small intraoperative images, which he said portrayed the biceps tendon looking "pretty good," but then he agreed the images showed fraying, albeit small. Dr. Baxter's characterization is contradictory and less convincing.

Dr. Baxter relied heavily on the MRI. Dr. Jones conceded that the MRI showed no pathology. However, Dr. Jones plausibly explained that other "signs and symptoms" were suggestive of labral tearing and the need for surgery, and that he had found "very specific anterior shoulder pain." Dr. Baxter said MRIs are ninety-six percent accurate, but he acknowledged that in other cases he had performed surgery and reached different conclusions than what an MRI had suggested. In sum, while MRIs are generally quite reliable, they are diagnostic tests and do not offer the same level of accuracy as actually performing surgery and observing the shoulder. And while it is unusual that the MRI apparently missed two of the tears that Dr. Jones discovered, it is not impossible.

In sum, Dr. Jones's opinion is consistent, based on better information, and more reliable than Dr. Baxter's, and the Court holds that Mr. Said rebutted the presumption of correctness afforded to Dr. Baxter's causation opinion.

*Requested Relief*

Since Mr. Said's injury is compensable, the Court considers his entitlement to five general categories of requested benefits.

First, as to medical benefits, the Workers' Compensation Law requires an employer to provide reasonable, necessary treatment at no cost to the injured worker. Tenn. Code Ann. § 50-6-204. Looking ahead, this means CTDI shall provide future medical benefits with Dr. Jones for Mr. Said's left shoulder relative to the work injury.

Looking backward, it means that CTDI is responsible for Dr. Jones's past treatment. The Tennessee Supreme Court explained the particulars of this responsibility in *Moore v. Town of Collierville,* 124 S.W.3d 93, 98 (Tenn. 2004), as follows:

> When an employee receives medical care for a work-related injury that has not been authorized by the employer, the employee must establish the necessity and reasonableness of the charges before the employer is responsible. Where an employer is liable for such medical expenses, the employer must pay the medical providers directly for the costs of such care,

7

> rather than the employee personally. Where the employee has personally paid for the disputed medical treatment, however, the employer shall reimburse the employee personally.

(Internal citations omitted). CTDI agreed to the reasonable necessity of the charges for Mr. Said's treatment with Dr. Jones. Therefore, CTDI shall repay the health insurer in accordance with the fee schedule for payments to Dr. Jones, the surgery center and physical therapy. It shall also reimburse Mr. Said for his out-of-pocket payments to those providers.

Mr. Said additionally requested reimbursement for mileage to his medical appointments. However, he testified that he did not know how far away he lives from Dr. Jones's office, and the Court declined during the hearing to take judicial notice of a printed Google Maps mileage calculation. Therefore, Mr. Said did not prove entitlement to mileage.

Second, Mr. Said requested temporary disability benefits. The Court finds him eligible for these benefits for two periods.

An injured worker is eligible for temporary total disability benefits if: (1) the worker became disabled from working due to a compensable injury; (2) there is a causal connection between the injury and the inability to work; and (3) the worker established the duration of the period of disability. *Simpson v. Satterfield,* 564 S.W.2d 953, 955 (Tenn. 1978). Temporary total disability benefits are terminated either by the ability to return to work or attainment of maximum recovery. *Id.*

Here, Dr. Jones took Mr. Said off work from February 23, 2018, until maximum medical improvement in October. However, by his own admission, Mr. Said began working in his restaurant on or about June 1. The Court finds he is entitled to temporary total disability from February 23 through May 31. The stipulated compensation rate of $370.23 per week, or $52.89 per day, times ninety-seven days totals $5,130.33.

Temporary partial disability benefits are available when the temporary disability is not total. *See* Tenn. Code Ann. § 50-6-207(1)-(2). Specifically, "[t]emporary partial disability refers to the time, if any, during which the injured employee is able to resume some gainful employment but has not reached maximum recovery." *Williams v. Saturn Corp.,* No. M2004-01215-WC-R3-CV, 2005 Tenn. LEXIS 1032, at *6 (Tenn. Workers' Comp. Panel Nov. 15, 2005). In circumstances where the treating physician has released the injured worker to return to work with restrictions prior to maximum medical improvement and the employer cannot return the employee to work within the restrictions, the injured worker may be eligible for temporary partial disability. *Jones v. Crencor Leasing and Sales,* 2015 TN Wrk. Comp. App. Bd. LEXIS 48, at *8 (Dec. 11, 2015).

Applying these standards, the Court finds that Dr. Baxter gave work restrictions on October 31 until placing him at maximum medical improvement on December 11. By Mr. Said's unrefuted testimony, CTDI did not accommodate the restrictions during that time.

It also did not pay temporary disability benefits. The Court finds he is entitled to temporary partial disability benefits for that period, totaling $2,168.49 (forty-one days times $52.89).[3]

Third, Mr. Said requested permanent disability benefits. When a worker suffers a compensable work injury, reaches maximum medical improvement, and is assigned a permanent medical impairment rating, he is entitled to receive permanent disability benefits. *See* Tenn. Code Ann. § 50-6-207(3)(A).

Here, Dr. Jones clearly testified that his rating is three percent to the upper extremity, which he then stated equals one percent to the body as a whole. Impairment ratings are assessed using the *AMA Guides,* 6th edition. *See generally* Tenn. Code Ann. § 204(k)(2). Mr. Said's counsel correctly pointed out that Table 15-11 on page 420 of the *Guides* converts upper-extremity impairments to whole-person impairments. The Court takes judicial notice of Table 15-11 and concludes that the correct whole-person impairment for a three-percent upper extremity rating is two-percent whole person, so this award is $3,332.07 (.02 times 450 weeks times $370.23).

CTDI argued that Dr. Jones improperly assigned a rating based on Mr. Said's pain complaints. Tennessee Code Annotated section 50-6-204(k)(3) says a physician "shall not consider complaints of pain in calculating the degree of impairment, notwithstanding allowances for pain provided by the applicable edition of the AMA guides[.]" In this case, Dr. Jones acknowledged that he considered "subjective complaints of pain," but he also weighed the "actual pathologies, actual anatomical injury." He used a diagnosis-based approach to reach his rating. Pain was only a part of Dr. Jones's reasoning. The Court rejects this argument.

Fourth, Mr. Said seeks increased permanent partial disability benefits under Tennessee Code Annotated section 50-6-207(3)(B). This provision states that if, at the end of the initial period of compensation, the employee has not returned to work for any employer at an equal or greater rate of pay as before the injury, then the employee qualifies for an increased benefit. CTDI argued that Mr. Said did not prove these requirements, and the Court agrees. Mr. Said's initial period of compensation ended on December 11, 2018, nine weeks after Dr. Jones placed him at maximum medical improvement on October 9, 2018. *See* Tenn. Code Ann. § 50-6-207(3)(A). Mr. Said testified that he began operating and managing a restaurant in *June* 2018, before the initial period ended, and he offered no proof as to whether he was earning less than his pre-injury earnings on December 11, 2018. This request is denied.

Fifth and finally, Mr. Said seeks an order that CTDI pay attorney's fees for a wrongful denial. A judge may award reasonable attorney's fees when the employer

---

[3] Mr. Said argued entitlement to temporary disability benefits for other periods where other providers restricted him from work or took him off work. However, at a compensation hearing, periods of disability must be shown through expert opinion in the form of either a C-32 or deposition testimony. *See* Tenn. Code Ann. § 50-6-235(c)(1). Therefore, the Court only considers work restrictions from Drs. Baxter and Jones.

"[w]rongfully denies a claim or wrongfully fails to timely initiate any of the benefits to which the employee or dependent is entitled under this chapter[.] . . . '[W]rongfully' means erroneous, incorrect, or otherwise inconsistent with the law or facts." Tenn. Code Ann. § 50-6-226(d)(1)(B). "[I]t is within a trial court's discretion to consider an employer's decision to deny a claim in light of evidence or other information reasonably available to the employer at the time the claim was denied. Moreover, such a determination is fact-dependent." *Andrews v. Yates Servs., LLC,* 2018 TN Wrk. Comp. App. Bd. LEXIS 22, at *12 (May 8, 2018).

Here, CTDI authorized treatment with Dr. Baxter until he placed Mr. Said at maximum medical improvement, and then it allowed a return visit in February 2018. At that visit, Dr. Baxter repeated that he did not believe the injury was work-related. Only then did CTDI deny the claim.[4] Mr. Said argued that because he needed further treatment with Dr. Jones, this denial was wrongful. The Court disagrees. *Andrews* dictates that this Court consider the information available to the employer at the time of the denial. At that time, the only opinion on the work-relatedness of Mr. Said's claim was from the authorized treating physician, who believed the injury was not work-related, and whose opinion is presumed correct. CTDI reasonably relied on this opinion at the time. To award fees now, relying on Dr. Jones's opinion, is hindsight, which the Court declines to use.

The Court similarly finds no basis to refer the case to the Compliance Program for consideration of penalties.

**IT IS, THEREFORE, ORDERED AS FOLLOWS:**

1. CTDI shall provide reasonable and necessary future medical benefits with Dr. Jones for Mr. Said's left shoulder work injury.

2. CTDI shall repay the health insurer under the fee schedule for payments to Dr. Jones, the surgery center and physical therapy.

3. CTDI shall reimburse Mr. Said for his out-of-pocket payments: $210.00 to Dr. Jones; $910.00 for physical therapy; and $271.71 to the surgery center.

4. CTDI shall pay Mr. Said temporary total disability benefits of $5,130.33 and temporary partial disability benefits of $2,168.49. CTDI shall pay Mr. Said permanent partial disability benefits of $3,332.07.

5. His attorney is entitled to a twenty-percent fee from these awards under Tennessee Code Annotated section 50-6-226(a)(1), or $2,126.18. Mr. Said's attorney may file a motion for discretionary costs and an affidavit under Rule 54

---

[4] Mr. Said testified that CTDI denied the claim previously in August 2017 but did not introduce evidence of this denial. Regardless, CTDI provided authorized treatment afterward with Concentra and Dr. Baxter, nullifying any alleged previous denial.

of the Tennessee Rules of Civil Procedure.

6. The Court taxes the $150.00 filing fee to CTDI, to be paid to the Court Clerk under Tennessee Compilation Rules and Regulations 0800-02-21-.06 (August, 2019) within five business days of this order becoming final, and for which execution might issue if necessary.

7. CTDI shall file a Statistical Data Form (SD-2) with the Court Clerk within five business days of the date this order becomes final.

8. Unless appealed, this order shall become final thirty days after entry.

**ENTERED December 22, 2020.**


_Kenneth M. Switzer_
**Judge Kenneth M. Switzer**
**Court of Workers' Compensation Claims**


## APPENDIX

Technical Record
1) Petition for Benefit Determination with attached Exhibit A (August 7, 2020)
2) Dispute Certification Notice and Employee's list of issues
3) Scheduling Order
4) Pre-Compensation Hearing Brief of CTDI
5) Pre-Compensation Hearing Statement of CTDI
6) Employee's Pretrial Statement
7) Employee's Pretrial Brief
8) Employee's Pretrial Witness List & Exhibits

Evidence
1) First Report of Injury
2) Wage statement
3) Employer letter to Mr. Said denying further treatment, 2/13/18
4) Mr. Said's Affidavit
5) CTDI New Hire Form
6) CTDI job description
7) Dr. Jones's deposition transcript and exhibits
8) Dr. Baxter's deposition transcript and exhibits
9) Medical records from miscellaneous providers
       9a) Vanderbilt Belle Meade, 1/12/17
       9b) Concentra, Dr. Carver, 8/31/17

9c) Dr. Wandass restrictions, 2/22/2018
9d) Dr. Jones restrictions, 4/20/18
9e) Concentra, Dr. Carver, 9/20/17
10) Dr. Jones Affidavit and attachments
11) Petition for Benefit Determination (March 2018) and Dispute Resolution Statement (July 2018): Identification Only

## CERTIFICATE OF SERVICE

I certify that a copy of this Compensation Order was sent as indicated on December 22, 2020.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|---|---|---|---|---|
| Linda Sue Nicklos, Employee's attorney | | | X | lindasuenicklos@gmail.com |
| Michael Haynie, Employer's Attorney | | | X | mhaynie@manierherod.com |

_____

**Penny Shrum, Court Clerk**
**Court of Workers' Compensation Claims**

12



<u>Compensation Hearing Order Right to Appeal</u>:

If you disagree with this Compensation Hearing Order, you may appeal to the Workers' Compensation Appeals Board or the Tennessee Supreme Court. To appeal to the Workers' Compensation Appeals Board, you must:

1. Complete the enclosed form entitled: "Notice of Appeal," and file the form with the Clerk of the Court of Workers' Compensation Claims *within thirty calendar days* of the date the compensation hearing order was filed. When filing the Notice of Appeal, you must serve a copy upon the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing of the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You bear the responsibility of ensuring a complete record on appeal. You may request from the court clerk the audio recording of the hearing for a $25.00 fee. A licensed court reporter must prepare a transcript and file it with the court clerk *within fifteen calendar days* of the filing the Notice of Appeal. Alternatively, you may file a statement of the evidence prepared jointly by both parties *within fifteen calendar days* of the filing of the Notice of Appeal. The statement of the evidence must convey a complete and accurate account of the hearing. The Workers' Compensation Judge must approve the statement of the evidence before the record is submitted to the Appeals Board. If the Appeals Board is called upon to review testimony or other proof concerning factual matters, the absence of a transcript or statement of the evidence can be a significant obstacle to meaningful appellate review.

4. After the Workers' Compensation Judge approves the record and the court clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties. The appealing party has *fifteen calendar days* after the date of that notice to submit a brief to the Appeals Board. *See the Practices and Procedures of the Workers' Compensation Appeals Board.*

**To appeal your case directly to the Tennessee Supreme Court, the Compensation Hearing Order must be final and you must comply with the Tennessee Rules of Appellate Procedure. If neither party timely files an appeal with the Appeals Board, the trial court's Order will become final by operation of law thirty calendar days after entry.** *See* **Tenn. Code Ann. § 50-6-239(c)(7).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



## NOTICE OF APPEAL
Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

Docket No.: _____

State File No.: _____

Date of Injury: _____

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the
Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-
stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____    ☐ Motion Order filed on _____

☐ Compensation Order filed on_____    ☐ Other Order filed on_____

issued by Judge _____.

### Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____
_____
_____
_____

### Parties

**Appellant(s)** (Requesting Party): _____ ☐ Employer ☐ Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐ Employer ☐ Employee
Appellee's Address: _____ Phone: _____
Email: _____
Attorney's Name: _____ BPR#: _____
Attorney's Email: _____ Phone: _____
Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 ____.

_____
*[Signature of appellant or attorney for appellant]*